IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| EDOUARD K. ZOUTOMOU,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>KENNECOTT UTAH COPPER,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:10-CV-719-TC |

      In this employment discrimination case, Plaintiff Edouard K. Zoutomou, a U.S. citizen and native of west Africa, brings claims against his former employer, Defendant Kennecott Utah Copper, for age, race, color, and national origin discrimination, and for retaliatory discharge. He brings these claims under Title VII of the Civil Rights Act of 1964 (Title VII) and the Age Discrimination in Employment Act (ADEA).[1]

      Kennecott has filed a motion for summary judgment, contending, among other things, that Mr. Zoutomou cannot establish a prima facie case of discrimination or retaliation. For the reasons set forth below, the court GRANTS Kennecott's motion for summary judgment.[2]

_____

     [1]Mr. Zoutomou filed his papers in a *pro se* capacity. But at the court's January 7, 2013 hearing on Kennecott's Motion for Summary Judgment, Mr. Zoutomou was represented by an attorney.

     [2]Mr. Zoutomou, in his opposition brief, raised new claims relating to pay and work transfers. This was the first time he articulated those claims in this case (the claims are not set forth in his amended complaint). Because the claims are untimely, the court disregards them.

## I.  FACTUAL BACKGROUND

Plaintiff Edouard Zoutomou (who was older than forty at the time these events occurred)[3] was employed by Kennecott Utah Copper as a senior metallurgical engineer in Kennecott's Utah smelter from March 2002 until May 2006, when he was discharged from his job.  Kennecott says it terminated Mr. Zoutomou for cause based on Mr. Zoutomou's unacceptable job performance, including his consistent failure to get along and work effectively with co-workers.

Before Mr. Zoutomou worked for Kennecott Utah Copper, he worked for Rio Tinto (Kennecott's parent company) in other locations, including as a process operations manager at the Rawhide mine in Nevada.  But in early 2002, the Rawhide mine closed.  Mr. Zoutomou, along with the vast majority of employees at that mine, lost his job at that facility.  In early 2002, he interviewed with Kennecott for a process engineer position at the smelter.  The only position available for someone with Mr. Zoutomou's qualifications was senior metallurgical engineer. The job was originally listed as a "C band" position.  At Rawhide, Mr. Zoutomou worked in a higher "EO band" position.  When Kennecott hired Mr. Zoutomou, Kennecott agreed to upgrade his new position at the smelter to a "D band" (a level below "EO band") and to pay him the same salary he was earning at the Rawhide mine.  As a result, he was the highest paid senior metallurgical engineer at Kennecott.

Beginning in March 2002, Mr. Zoutomou worked with the smelter's hot metals crew.  In 2004, he transferred to the smelter's hydrometallurgical plant (the "Hydromet").[4]  During his

---

[3]The Age Discrimination in Employment Act (ADEA) protects employees who are over the age of forty.

[4]The Hydromet treats and reprocesses waste streams from Kennecott's smelter to comply with environmental regulations and to obtain greater value from them.

tenure at Kennecott, Mr. Zoutomou reported to technical superintendent, David George-Kennedy (who was also the person who initially interviewed and hired Mr. Zoutomou).  Although he provided technical advice to operators and their supervisors regarding the functioning of the Hydromet, Mr. Zoutomou did not manage or supervise employees at the smelter.  Instead, the Hydromet employees reported to Brian Giles (the supervisor of the Hydromet) and Bob Ordoqui (superintendent over the Hydromet and the acid plant).

Mr. Zoutomou's job required him to work with the Hydromet's operators and maintenance workers on a daily, collaborative basis to monitor the flow and operation of the Hydromet and to resolve technical issues.  Mr. Zoutomou also worked with maintenance workers to address mechanical issues.  And Mr. Zoutomou needed to collaborate on a day-to-day basis with Mr. George-Kennedy, Mr. Giles, and Mr. Ordoqui.

Because Mr. Zoutomou was not a supervisor, he needed the operators to agree to implement his suggested changes to the Hydromet process.  Spending time on the floor of the Hydromet every day, he and the operators relied on each other to communicate information necessary to do their jobs.  But they often had different viewpoints on how to operate the Hydromet—Mr. Zoutomou from an engineering perspective and the operators from an operational perspective.

The record shows that Mr. Zoutomou had difficulty working effectively with others, as even he recognized.  For example, in a July 2005 email to Mr. George-Kennedy, Mr. Zoutomou described communication problems he was having with two operators in the Hydromet.  (See July 25, 2005 Mem. from Mr. Zoutomou to Mr. George-Kennedy, attached as Ex. I to Def.'s Mem. Supp. Mot. Summ. J.)

Mr. Ordoqui said it was difficult working with Mr. Zoutomou on his team.  Before Mr. Zoutomou was discharged from his job, Mr. Ordoqui received complaints from many different employees, including supervisors, maintenance personnel, and operators, about the way Mr. Zoutomou dealt with others.  Mr. Zoutomou's co-workers complained that he was rude and arrogant, would not listen, and was otherwise difficult to deal with.  Mr. Ordoqui was told that Mr. Zoutomou treated other workers "as inferior" and yelled at them.  (See May 17, 2006 Letter from Robert Ordoqui to David George-Kennedy, attached as Ex. G to Def.'s Mem. Supp. Mot. Summ. J.)  Some employees voiced safety concerns after they allegedly heard Mr. Zoutomou say that it was okay if a couple of workers were exposed to hydrogen sulfide (a highly flammable and poisonous gas).  Mr. Zoutomou denies that he said that (see Nov. 28, 2005 email from Mr. Zoutomou to Paula Olson, attached as Ex. O to Def.'s Mem. Supp. Mot. Summ. J.), but the concern nevertheless registered with Kennecott management, including Mr. Giles.

Mr. Giles met with Mr. Zoutomou on several occasions to discuss problems with Mr. Zoutomou's attitude and demeanor.  Mr. Giles noted, in a letter to David George-Kennedy, that although Mr. Zoutomou "has shown that he can be very nice and understanding, . . . at other times he has a tendency toward making demands in a rude, almost abusive manner."  (May 17, 2006 Letter from Brian R. Giles to David George-Kennedy, attached as Ex. H to Def.'s Mem. Supp. Mot. Summ. J.)

According to Mr. Giles' letter, Mr. Zoutomou said that he did not have to follow procedures required for entry into the Hydromet building because he was the process engineer.  Mr. Zoutomou would "often enter the building without the area operator's knowledge and put[] himself at risk.  This [was] especially so if there were to be an 'upset' in the process and a release

4

of SO2/H2S or Arsine gas." (Id. at 2.)  Mr. Giles enumerated other concerns about safety issues

and outbursts by Mr. Zoutomou.  He ended the letter by saying:

> My dealings with Ed are he is difficult to communicate with and has an arrogant
> behavior towards people.  We have tried to communicate with him and let him
> know the difficulties his attitude and demeanor presents for our team.  We have
> asked him to make some changes but have not seen any change or improvement
> over the past six months.  Ed is a very intelligent individual and he has a great
> amount of knowledge but lacks a "common sense" factor that is needed while
> working at an industrial facility.

(Id.)

In August 2005, in an effort to fix the problem, his supervisor required Mr. Zoutomou to

put together a "Performance Improvement Action Plan" setting forth specific goals for

improvement in certain areas of Hydromet operation.  The target date for improvement was

November 2005.  (See Ex. L to Def.'s Mem. Supp. Mot. Summ. J.)  Also in August 2005, Mr.

George-Kennedy drafted a Performance Improvement Plan (PIP) for Mr. Zoutomou.  (See Ex. M

to Def.'s Mem. Supp. Mot. Summ. J.)

The first performance problem listed in the PIP was Mr. Zoutomou's "Lack of

ownership." (Id.)  This included the statement that "[i]nteraction with plant people not sufficient

for the type of [role]." (Id.)

The second performance problem was identified as "More energy needed." (Id.)  Under

that heading, Mr. George-Kennedy listed the following:

- Lack of progress in Control and Response Plan rollout, auditing and new
  content development
- United operations and process performance issues not adequately
  identified, prioritized and rectified
- Lack of progress in process quantitative identification

(Id.)  Although Mr. Zoutomou stated in his deposition that he is not certain what Mr. George-

5

Kennedy meant by "more energy needed," he now speculates that the reference to a need for

more energy must have been a reference to more physical energy and a veiled reference to Mr.

Zoutomou's age.  (Yet he acknowledged that the items under the heading "more energy needed"

required mental sharpness, not physical energy, and that he would not have had a problem with

the statement if it meant mental sharpness.)

      Mr. George-Kennedy then made the following comment in the PIP:

> Delay in rectification of Hydromet operational, equipment and process issues has
> resulted in continued poor compliance with plant performance criteria with
> respect to Arsenic and Bismuth rejection.  If these issues are not resolved quickly,
> serious impacts to anode and cathode quality will continue to impede the business.
> <u>If Ed's personal targets are not satisfied within the agreed timeframe he will be
> removed from his current position.</u>

(<u>Id.</u> (emphasis added).)  Mr. Zoutomou signed the PIP on August 5, 2005, acknowledging that he

discussed the contents of the PIP with Mr. George-Kennedy.  (<u>Id.</u>)

      In addition to the PIP, Mr. Zoutomou's bonus review in December 2005 showed

continued performance problems.  To promote productivity, Kennecott offers a Short-Term

Incentive Program (STIP), which provides yearly bonuses to employees who achieve certain

goals.  Under the STIP, an employee's bonus is determined by reference to both company

performance and the employee's individual performance.  In reviewing Mr. Zoutomou's

performance for 2005, Mr. George-Kennedy again emphasized that Mr. Zoutomou needed to

"take ownership" and needed "more energy."  (STIP 2005, attached as Ex. P to Def.'s Mem.

Supp. Mot. Summ. J.)  He listed areas where he believed Mr. Zoutomou's performance did not

meet expectations.  He also gave Mr. Zoutomou a low score in the "Developing People"

category.  Although Mr. Zoutomou did receive a bonus, the STIP report documents problems

with his performance and his ability to effectively communicate and work with others.

In May 2006, a confrontation between Mr. Zoutomou and senior plant operator Paula Olson highlighted the fact that Mr. Zoutomou's problems cooperating with operators continued. During the confrontation, which occurred in the "thickener" and concerned safety protocol, Mr. Zoutomou yelled at Ms. Olson and other operators. Mr. Giles, who discussed the problem with the employees, believed Ms. Olson's version of what occurred.[5]

Although Kennecott had asked Mr. Zoutomou to change his behavior, including his attitude and demeanor, the company saw no improvement in the six months before his discharge. As a consequence of his inability to work well with others, Kennecott ultimately concluded that Mr. Zoutomou could not effectively do the job of improving the Hydromet's operations, particularly as spelled out in the PIP.

In a letter dated May 15, 2006, Kennecott terminated Mr. Zoutomou's employment. In the letter, his supervisor, Mr. George-Kennedy, stated that Mr. Zoutomou had failed to satisfy the company's performance expectations, including those expectations set forth in his PIP and the company's request that he improve his working relationship with others. Kennecott did not rely solely on Mr. Zoutomou's performance of items in the PIP. Kennecott does not have a progressive disciplinary process. Instead, Kennecott used the PIP in a non-disciplinary fashion.

---

[5]Soon after the incident, Kennecott began to investigate what occurred at the thickener on May 4, 2006. In a May 25, 2006 incident report that was finalized after Mr. Zoutomou's employment was terminated, Kennecott determined that Mr. Zoutomou had violated Kennecott's confined-space policy. But Kennecott adamantly contends that the safety violation was not a reason for terminating Mr. Zoutomou's employment. Kennecott explains that Mr. Zoutomou's "safety violation served to highlight his complete inability to work effectively with others." (Def.'s Mem. Supp. Mot. Summ. J. (Docket No. 43) at 7.) Indeed, the investigation of the safety violation did not conclude until after Mr. Zoutomou had been discharged from his job.

The PIP was not a contract, Mr. Zoutomou was an at-will employee, and the PIP was only one of the factors cited by Kennecott to explain its reasoning.

After his discharge, Mr. Zoutomou wrote a letter to Kennecott's Director of Organizational Development appealing the termination of his employment.  In his letter, he does not mention age, race, color, or national origin, much less contend that such factors played a role in Kennecott's decision to terminate his employment.  Indeed, during his tenure, Mr. Zoutomou never reported or otherwise communicated that he suffered any adverse action because of his race or age.

After an appeal to the Utah Antidiscrimination and Labor Division (UALD), which was dismissed by the UALD,[6] Mr. Zoutomou filed his claims against Kennecott in this court.

## II.  ANALYSIS

### A.      Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if it demonstrates, through pleadings, depositions, answers to interrogatories, admissions on file, or affidavits, that there is no genuine issue as to any material fact.  Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when, after viewing the record and making all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

---

[6]Mr. Zoutomou appealed the UALD's dismissal to the Adjudication Division of the Utah Labor Commission.  He pursued that appeal for more than a year before withdrawing his charge of discrimination in front of the UALD.

The opposing party's response must set forth specific facts showing a genuine issue for trial, and it "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient." Anderson, 477 U.S. at 252.

**B.     Claims of Discrimination under Title VII and the ADEA**

"Title VII prohibits an employer from terminating any individual because of 'race, color, religion, sex, or nation origin,' 42 U.S.C. § 2000e-2(a)(1), or because that individual opposed unlawful discrimination, 42 U.S.C. § 2000e-3(a)." Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006). Similarly, the ADEA prohibits an employer from discharging an employee based on his age if the employee is over the age of forty. See Rivera v. City & County of Denver, 365 F.3d 912, 915 (10th Cir. 2004) (citing ADEA, 29 U.S.C. § § 621-34).

Under both Title VII and the ADEA, if there is no direct evidence of discrimination or retaliation, as is the situation here, the court must apply the familiar burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Antonio, 458 F.3d at 1181 (Title VII claim); Rivera, 365 F.3d at 920 (ADEA claim).

**1.     Burden Shifting Analytical Framework**

The McDonnell Douglas burden-shifting framework has three parts. First, Mr. Zoutomou must establish a prima facie case of discrimination. Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006) (retaliation case); Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (Title VII discrimination case); Rivera, 365 F.3d at 920 (ADEA discrimination case). The evidentiary burden of establishing a prima facie case by a preponderance of the evidence is "not

onerous," particularly because the burden is "one of production, not persuasion; it can involve no credibility assessment."  Plotke, 405 F.3d at 1099 (internal quotation marks and citations omitted).  If he establishes a prima facie case, the burden shifts to Kennecott, the employer, to show a legitimate non-discriminatory reason for the adverse employment action.  Id.  If the employer satisfies its burden, the burden shifts back to the employee to demonstrate that the employer's proffered reason for the adverse employment action is pretext.  Id.

**2.    Claims of discrimination on the basis of race, color, or national origin under Title VII**

        a.    Prima Facie Case

To establish a prima facie case of discrimination on the basis of race, color, or national origin, Mr. Zoutomou must present evidence that (1) he is a member of a protected class; (2) he was qualified for and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination.  Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004); Hoko v. Huish Detergents, Inc., 453 Fed. Appx. 799, Case No. 11-4016, 2011 WL 6762962, **3 (Dec. 27, 2011) (citing EEOC v. PVNF, LLC, 487 F.3d 790, 800 (10th Cir. 2007)).  Kennecott does not dispute that Mr. Zoutomou, an African-American and native of west Africa, is a member of the protected classes of race, color, and national origin. Instead, Kennecott contends that Mr. Zoutomou cannot establish the second and third elements of his claim: job performance and inference of discrimination.

                (I)    *Mr. Zoutomou's Job Performance*

There is considerable documentary evidence of the many individuals Mr. Zoutomou had trouble getting along with, and no evidence that the employees Mr. Zoutomou complains about

had trouble getting along with others.  Mr. Zoutomou was informed on numerous occasions of

his performance deficiencies, including in conversations, his PIP, and his STIP.

According to Kennecott, the following is evidence of its reasons for terminating Mr.

Zoutomou:

- His history of problems interacting effectively with others, including past performance reviews and his difficulties interacting with others as highlighted in his deposition testimony;

- The documented complaints about his conduct;

- Conversations with plant supervisors regarding his conduct;

- His PIP, which, among other things, addressed his lack of ownership and his need to improve his interactions with other plant workers;

- His PIP review, which indicated that his long-term career at Rio Tinto depended on his ability to get the Hydromet running in the next six months, which Plaintiff admits required appropriate collaboration with his co-workers;

- His 2005 STIP review, on which he received low scores for "collaborative behavior" and "developing people"; and

- His poor and improper reaction to his safety violation on May 4, 2006.

(Def.'s Reply Mem. (Docket No. 52) at 9.)  All of this leads the court to conclude that Mr.

Zoutomou was not performing his job satisfactorily.  Accordingly, he has not established the

second prong of his prima facie case of discrimination.

(ii)     *No Inference of Discrimination*

The circumstances surrounding Mr. Zoutomou's termination do not give rise to an

inference of discrimination.  Mr. Zoutomou does not point to any racial comment by any

11

employee or manager at Kennecott.  Indeed, there is no evidence of racial animus (either through comments or acts) in the record.  Similarly, the record lacks any evidence that the relevant events had any connection to Mr. Zoutomou's origin from west Africa.

Nevertheless, Mr. Zoutomou asserts that he is allowed an inference of discrimination because his co-workers did not get along with him precisely because he is black, from a foreign country, and older than they.  (See Tr. at 23, 29, 38, 45.)  This is circular reasoning and is not sufficient to establish an inference of discrimination.

### b.   Legitimate Non-Discriminatory Reason

Even if Mr. Zoutomou had established a prima facie case of discrimination, Kennecott has provided a legitimate non-discriminatory reason for discharging Mr. Zoutomou.  Kennecott reasonably determined that the ability to work effectively with others in the operation and maintenance of the Hydromet was a necessary skill for someone in Mr. Zoutomou's position and that Mr. Zoutomou did not possess that skill, despite having multiple opportunities to develop it. The evidence in the record supports Kennecott's reasonable explanation.

### c.   Pretext

To establish pretext, Mr. Zoutomou must show that Kennecott's explanation of the reasons for his discharge is "unworthy of credence."  Jaramillo v. Colorado Judicial Dep't, 427 F.3d 1303, 1309 (10th Cir. 2005).  The court must not analyze the situation in light of the employee's subjective view of the situation.  EEOC v. C.R. England, Inc., 644 F.3d 1028, 1044 (10th Cir. 2011).  Instead, the court must consider "the facts as they appeared to the person making the decision" and may not "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment."  Riggs v. AirTran Airways,

Inc., 497 F.3d 1108, 1119 (10th Cir. 2007).  In other words, the court must not "act as a super

personnel department that second guesses employers' business judgments." Jaramillo, 427 F.3d

at 1308 (internal citations and quotation marks omitted).  There is not much to analyze because

Mr. Zoutomou does not present any admissible evidence to dispute the reasons offered by

Kennecott.  He simply cannot show pretext.

      **3.**      **Claim of age discrimination under the ADEA**

To establish a prima facie case of age discrimination, Mr. Zoutomou must show that

(1) he was at least forty-years-old at the time of the adverse employment action; (2) he performed

satisfactory work; (3) he was terminated from employment; and (4) Kennecott hired a younger

person to fill Mr. Zoutomou's job.  Wilkerson v. Shinseki, 606 F.3d 1256, 1266 (10th Cir. 2010);

Rivera v. City & County of Denver, 365 F.3d 912, 920 (10th Cir. 2004).

Here, it is not disputed that Mr. Zoutomou was at least forty-years-old when he was fired

from his job and that Kennecott hired someone younger than Mr. Zoutomou to fill the position.

The question is whether Mr. Zoutomou has presented evidence that he was satisfactorily

performing his job.  The facts discussed above concerning Mr. Zoutomou's job performance

apply equally here.  Mr. Zoutomou has not established that he was performing his job in a

manner satisfactory to Kennecott.  Accordingly, he has not established a prima facie case under

the ADEA.

But even if he had, Kennecott has presented a legitimate non-discriminatory reason for

his termination, as discussed above.

And although Mr. Zoutomou contends that his age "became the ultimate reason" for his

termination (First Am. Compl. at ¶ 20), he cannot point to any evidence that would call into

doubt Kennecott's stated reason for terminating his employment.

Mr. Zoutomou claims that he was not given the same level of respect that younger employees received, he was told he needed more energy, and Kennecott once considered promoting a younger employee over him and allegedly told him that "if you stay in this place, you're going to be doing exactly the kind of thing you don't like to do, that is, work for younger guys." (Id. ¶¶ 10, 16, 17.)

Primarily, Mr. Zoutomou points to the language "more energy needed" as a reference to his age. But Mr. Zoutomou admitted in his deposition that he is not sure what Mr. George-Kennedy meant or whether the comment referred to his age. Even if the comment were age-related (and the context strongly suggests that it was not—even Mr. Zoutomou acknowledged that the matters listed in the PIP under the "more energy" category called for mental sharpness, not physical energy), it was an ambiguous "stray remark" that does not create an inference of age-related discrimination. See Stone v. Autoliv ASP, Inc., 210 F.3d 1132, 1140 (10th Cir. 2000) (determining that "isolated" or "ambiguous" age-related comments were "too abstract" to support an inference of age discrimination); Doyle v. Nordam Group, Inc., 492 Fed. Appx. 846, Case No. 11-5004, 2012 WL 2820222, *853 n.5 (10th Cir. July 11, 2012) (determining that supervisor's "ageist statements," including that the plaintiff was not as "energetic" as younger applicants, "were appropriately categorized as 'stray remark[s]' or 'isolated [or] ambiguous comments' when read in context" and were not additional evidence of pretext) (alterations in original).

Mr. Zoutomou also points to Mr. George-Kennedy's comment that Mr. Zoutomou did not like working for younger supervisors. Yet he admitted that the comment grew out of Mr.

Zoutomou's stated belief that he had more experience and seniority.  (Zoutomou Dep. at 330, 332-33 (attached as Ex. A to Def.'s Mem. Supp. Mot. Summ. J.).)   Moreover, Mr. George-Kennedy's comment about working for a younger person was ambiguous and does not establish that Kennecott's stated reason for terminating Mr. Zoutomou's employment was pretext for age discrimination.  See Stone, 210 F.3d at 1140.

Mr. Zoutomou does not make any connection between any specific incident of "disrespect" and his age.  Moreover, it is not apparent how the specific comments about which he complains would be considered discriminatory.  "A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the company's termination decision, and therefore that age actually played a role in the defendant's decisionmaking process and had a determinative influence on the outcome."  Id. (internal quotation marks and citations omitted).  Mr. Zoutomou has not established such a nexus.  Indeed, Mr. Zoutomou is left with nothing more than pure speculation that Kennecott's decision to terminate his employment was based on age discrimination.  That is not enough to survive Kennecott's motion.  See C.R. England, 644 F.3d at 1044 ("'[M]ere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment.'") (quoting Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999)).

For the reasons stated above, Mr. Zoutomou's claim of age discrimination fails as a matter of law.

## C.   **Retaliation Claim**

Under Title VII, an employer may not retaliate against an employee who opposes an employment practice made illegal by Title VII.  See 42 U.S.C. § 2000e-3(a).  Retaliation claims,

like other Title VII claims, are analyzed under the burden-shifting analysis discussed above. See
Antonio v. Sygma Network, Inc., 458 F.3d 1177, 1181 (10th Cir. 2006).

To establish a prima facie case of retaliation under Title VII, Mr. Zoutomou must
demonstrate that (1) he engaged in protected activity (i.e., opposition to discrimination); (2) he
suffered a materially adverse employment action; and (3) there is a causal connection between
the protected activity and the adverse employment action.  Tabor v. Hilti, Inc., 703 F.3d 1206,
1219 (10th Cir. 2013).  Kennecott contends that Mr. Zoutomou cannot establish a prima facie
case because he has not presented any evidence that he engaged in a protected activity when he
was an employee of Kennecott.  The court agrees.

During oral argument, the court asked Mr. Zoutomou for evidence showing that he had
engaged in protected activity while employed by Kennecott.  Mr. Zoutomou, based on his
recollection, asserted that his protected activity was evidenced in his May 4, 2006 email to Mr.
George-Kennedy in which Mr. Zoutomou presents his side of the story about that day's reported
safety incident and his confrontation with Ms. Olson in the Hydromet thickener.  He apparently
believed that the email documented his complaint to Mr. George-Kennedy that Paula Olson
reported him for the safety violation in the thickener because she held an alleged racial animus
toward him.  (See Jan. 7, 2013 Tr. of Hr'g (Docket No. 57) at 30-32.)  But upon review of the
email during the hearing, it became apparent that Mr. Zoutomou's recollection was incorrect.
The relevant part of the email reads as follows:

> Please note that yesterday 05/03, I caught Paula Olson without [sic] carrying a
> respirator as required.  I confronted her and she tried to argue her way out.  When
> I pointed out the facts, she went and got the PPE and then stopped talking to me
> there after.  This "incident" [on May 4, 2006 in the thickener] is nothing less than
> an attempt by Paula to retaliate because I caught her without a required PPE.

16

(May 4, 2006 email from Mr. Zoutomou to Mr. George-Kennedy, attached as Ex. 2 to Pl.'s Mem. in Opp'n (Docket No. 48).)  That email contains no complaint about racial discrimination whatsoever.  In short, there is no admissible evidence in the record to support his assertion that he engaged in protected activity.

During the hearing (and in his opposition brief filed here), Mr. Zoutomou alternatively argued that he could not have reported the discrimination while he was employed because he did not learn of any discrimination until after his discharge.  That is, he claims he discovered a pattern of discrimination at Kennecott and that he would have been able to develop the theory of disparate treatment of similarly situated employees[7] and present evidence during the summary judgment phase if he had been given the chance to conduct the discovery he was denied earlier.[8]

His version of the facts actually supports Kennecott's position that he did not engage in any protected activity while an employee.  That is, he did not know about any discrimination so he could not have complained about it before his discharge; with no complaint, there was no protected activity during his employment.

In short, there is no evidence in the record that Mr. Zoutomou ever complained to

---

[7]It is not clear how Mr. Zoutomou defines "similarly situated persons."  He seemed to be saying, during oral argument, that similarly situated individuals would be employees who had a PIP and were never reprimanded or discharged for not getting along with co-workers.

[8]During the hearing, Mr. Zoutomou contended that he was wrongly denied an opportunity to conduct discovery on the subject of a pattern of discrimination at Kennecott.  He specifically pointed to an earlier order denying his motion to compel discovery on what he believed was the subject of a pattern of discrimination at Kennecott.  (See Docket Nos. 27-28, 32-35, 37, 41, 47, 53.)  He may not re-litigate that motion.  It was reviewed by the magistrate judge, who denied the motion.  Upon Mr. Zoutomou's objection, the court affirmed the magistrate judge's ruling.  Even if the court were to treat Mr. Zoutomou's concern as a motion to reconsider, the court stands by its order affirming the magistrate judge's order denying the motion to compel.

Kennecott about any alleged discrimination while he was working for the company.  Without evidence of a protected activity, Mr. Zoutomou's retaliation claim fails as a matter of law.

**ORDER**

For the foregoing reasons, Defendant Kennecott Utah Copper's Motion for Summary Judgment (Docket No. 42) is GRANTED.  The Clerk of the Court is directed to close this case.

DATED this 25th day of March, 2013.

BY THE COURT:

TENA CAMPBELL
U.S. District Court Judge